NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| KESHAWN MCNEIL, | Civil Action No. 18-10003 (JLL) |
| Petitioner, | |
| v. | OPINION |
| STEVEN JOHNSON, et al., | |
| Respondents. | |

**LINARES**, Chief District Judge:

Presently before the Court is the petition for a writ of habeas corpus of Keshawn McNeil

("Petitioner") brought pursuant to 28 U.S.C. § 2254 challenging his state court murder conviction.

(ECF No. 1). Respondents filed a response to the petition, (ECF No. 9), to which Petitioner replied,

(ECF No. 15). For the following reasons, the Court will deny the petition, and Petitioner is denied

a certificate of appealability.

## I.     BACKGROUND

In affirming Petitioner's conviction on direct appeal, the Superior Court of New Jersey,

Appellate Division, summarized the background of this matter as follows:

> [Petitioner was convicted of] first-degree conspiracy to commit
> robbery, [in violation of N.J. Stat. Ann. §§] 2C:5-2 and . . . 2C:15-
> 1[;] first-degree armed robbery, [in violation of N.J. Stat. Ann. §]
> 2C:15-1[;] first-degree felony murder, [in violation of N.J. Stat.
> Ann. §] 2C:11-3a(3)[;] first-degree aggravated manslaughter, [in
> violation of N.J. Stat. Ann. §] 2C:11-4a, as a lesser included offense
> of murder[;] third-degree unlawful possession of a handgun, [in
> violation of N.J. Stat. Ann. §] 2C:39-5b[;] and second-degree
> possession of a handgun for an unlawful purpose, [in violation of
> N.J. Stat. Ann. §] 2C:39-4a. The convictions arose from the robbery

1

and shooting of Fabio Borges, the landlord of [Petitioner]'s girlfriend, Staci Marshall.

Upon conviction, [Petitioner] was sentenced on the conviction for felony murder to life in prison with the thirty-year parole bar required by [N.J. Stat. Ann. §] 2C:11-3b and the eighty-five percent parole bar of the No Early Release Act (NERA), [N.J. Stat. Ann. §] 2C:43-7.2. The Graves Act was also held applicable to his sentence. *See* [N.J. Stat. Ann. §] 2C:43-6c. [Petitioner] was given a concurrent sentence of five years for unlawful possession of a handgun. The remaining convictions were merged and dismissed.

. . . .

The evidence introduced at trial was sufficient for the jury to conclude that, on February 24, 2007, [Petitioner]'s girlfriend, Marshall, was living with her twelve-year-old daughter in Newark in property owned by Fabio Borges and Liciane Nunes. On February 23, 2007, Marshall received an eviction notice for nonpayment of rent, addressed to another person. When Marshall called her landlords, she learned that eviction proceedings had been instituted against her, as well. She agreed to pay the overdue rent.

On the following day, while driving [Petitioner], an aspiring rap musician, to a video shoot at a studio in East Orange, Marshall mentioned the rent payment to him, and she said that she would be low on money after the rent was paid. [Petitioner] told her not to worry and that he would "get the money back." A plan was made that [Petitioner] would rob Borges after Marshall paid her rent, and then she and [Petitioner] would go to Atlantic City.

After rent in the amount of $1250 had been paid, Marshall contacted [Petitioner], who robbed Borges and, during the robbery, shot him, causing his death from a single gunshot wound to the chest. Following the robbery and shooting, Marshall drove to East Orange to meet [Petitioner]. She testified that, when she entered her car, the window was open, whereas it had been closed when she parked it across from her residence earlier in the day. She surmised the car had been driven by someone else. Additionally, she testified that [Petitioner] had a key to her car.

While in East Orange in Marshall's company, [Petitioner] disposed of Borges's wallet in a trash can and his credit cards in a sewer. Marshall and [Petitioner] also stopped at the studio where they had been on the previous day to talk to the studio engineer[, Daniel Laporte]. The two then took the 10:30 p.m. bus to Atlantic

City, where [Petitioner] gave Marshall $400 as gambling money. While in Atlantic City, either on that night or on a prior occasion (the evidence is in conflict on timing), Marshall took a picture of [Petitioner] on the beach holding a silver handgun that Marshall had seen in his possession on two prior occasions.

Initially, while in Atlantic City following the crimes, Marshall was aware that Borges had been robbed; she did not know that he had been shot. However, in the early morning hours, [Petitioner] informed her that he had shot Borges "in the area where he knew he would be okay" because he "felt like shooting [his] gun." Although upset by this information and fearful of a police investigation, Marshall returned with [Petitioner] to a casino, where they continued to gamble. They returned to Marshall's residence in Newark by the first morning bus.

Following a police interrogation, and despite threats of harm from [Petitioner], Marshall implicated [Petitioner] in the robbery and shooting, and eventually pled guilty to robbery and conspiracy in return for a proposed sentence of fifteen years, subject to NERA. In furtherance of the police's investigation of the crime, Marshall showed the police the location of Borges's wallet and credit cards, which were recovered. Prior to her sentencing, Marshall testified against [Petitioner] at trial.

A security camera at a school near Borges's home showed the approach of Marshall's car, with its lights out, backing down Borges's street, and it showed a person entering the passenger side of the car, but a search of the car disclosed no evidence. Additionally, the gun used in the murder was not found. However, ballistics evidence indicated that Borges had been shot by a .38 caliber bullet that could have been fired from either a revolver or an automatic weapon.

Kendra Brown, a resident in the building where [Petitioner] worked as a security guard, testified that on February 26, [Petitioner] placed a call using her phone, and at that time had muttered to himself that the recipient of the call should pick up the phone, because he needed an alibi.

[Petitioner] did not testify on his own behalf. His counsel argued in summation that no forensic evidence linked [Petitioner] to the crime, that Marshall had lied regarding his involvement to obtain the benefit of a favorable plea agreement, and that the crime had been planned and committed by Marshall and some other man,

likely, her former boyfriend. The jury nonetheless convicted [Petitioner] of all charges except purposeful murder.

. . . .

Prior to Marshall's testimony before the jury, the trial judge conducted a . . . hearing to determine the admissibility of Marshall's testimony that she had seen [Petitioner] with a gun both before and after the shooting of Borges. At the hearing, Marshall testified that in the early morning hours of February 25, 2007, she photographed [Petitioner] while he was standing on the beach holding a silver revolver. Two weeks prior to that date, she had seen the same gun in [Petitioner]'s hand in his lap as she drove [Petitioner] to a location to purchase bullets. Additionally, she had observed [Petitioner] holding the same gun while in her kitchen. The state also elicited from Marshall that, after confessing to Marshall that he had shot Borges, [Petitioner] admitted that he had used the silver revolver for that purpose. She never saw the gun again.

On cross-examination, counsel elicited testimony that on the first occasion, they had stopped at an apartment building on Grove Terrace in Irvington, [Petitioner] had gone into he building's basement, and he returned with a box of bullets. After getting back into the car, [Petitioner] took a single copper-colored bullet from the box and loaded it into the gun. During the following week, Marshall again saw the gun in [Petitioner]'s hand while the two were in the kitchen. After seeing it, she told him to put the gun in the safe in her closet or a drawer, so as to protect her daughter from possible harm.

At the conclusion of the hearing, defense counsel argued that Marshall's testimony was not credible and that the State had not demonstrated the admissibility of the evidence presented through her by clear and convincing evidence. However, counsel conceded that if the judge found the State's burden of proof to have been met, the evidence was admissible under [N.J. Rule of Evidence] 404(b). After a preliminary discussion of the charge that he would give, the judge ruled that the testimony was admissible[.] In doing so, the judge found Marshall's testimony and photographic evidence relevant as identifying [Petitioner] as an individual who possessed the handgun that allegedly was used to shoot Borges. He found the instances in which Marshall had seen the gun to have been reasonably close to the time that the crime was committed; he found Marshall's uncontroverted evidence to have been clear and convincing; and he found the probative value of the evidence not to be outweighed by its prejudicial impact.

Additionally, in connection with [that] hearing, the judge on several occasions discussed the charge that he intended to give following the introduction of the [Rule] 404(b) evidence, and an agreement was reached on its substance. However, the judge did not give the agreed-upon charge either immediately after the [Rule] 404(b) evidence had been introduced through Marshall's testimony or at the conclusion of [her] testimony. Rather, the testimony of Michael DeMaio, a lieutenant serving with the Homicide Squad of the Essex County Prosecutor's office was commenced. At the end of the day's proceeding and after the jury had been excused the judge [raised the issue before counsel and offered to provide the charge the following morning. Defense counsel responded by saying]

> You know, Judge, I actually thought of it as we were all moving kind of quick there and as I saw the detective begin his testimony[.] I might not have any problem with that, Judge, and it that's the way you want to proceed, do that in the morning. Or else, I'll just think about it overnight and maybe now that we've started his testimony, maybe it would be more appropriate just to wait [until] the end of the case with the [final jury] charge.

> . . . .

> I don't really have a strong opinion one-way or another, but I'll think about it overnight.

Two days later, the prosecutor again brought up the subject of the charge, and the following exchange occurred:

> [PROSECUTOR]: Judge, did you ever read the 404b charge?

> THE COURT: Did I read – no [be]cause [defense counsel] –

> [DEFENSE COUNSEL]: We figured we'd save it for the final charge –

> THE COURT: It has to go, as you know, into final charges for the jurors.

[PROSECUTOR]: I know, but I thought it also had to be read around or near the time of the testimony, that's what the case law wanted –

THE COURT: That's correct –

[DEFENSE COUNSEL]: We forgot to do it and the started DeMaio and we broke –

THE COURT: I was going to do it first thing the next morning –

[DEFENSE COUNSEL]: We had broke and I didn't address it. I had thought about it, I thought it was out of place at that point, and I'm not claiming any type of error based on it being read at the time, [be]cause I think it's gonna be fine at the end of the case.

At the conclusion of the trial, the judge properly instructed the jury, after describing the handgun evidence:

> In this case, the State introduced the evidence for the limited purpose of identifying [Petitioner] as an individual who noticed [sic] a handgun. Whether this evidence does, in fact, demonstrate the identity of [Petitioner] as someone who possessed a handgun is for you to decide. You may decide that the evidence does not demonstrate this identity and is not helpful to you at all. In that case, you must disregard the evidence.

> On the other hand, you may decide that the evidence does demonstrate the identity and use it for that specific purpose. However, you may not use this evidence to decide that [Petitioner] has a tendency to commit crimes or that he is a bad person. That is, you may not decide that just because [Petitioner] has committed other such acts, he must be guilty of the present crime. I've admitted the evidence only to help you decide the specific question of identity. You may not consider it for any other purpose and may not find [Petitioner] guilty now simply because the State has offered evidence that he committed such acts.

(ECF No. 9-7 at 1–15).

## II.    DISCUSSION

**A. Legal Standard**

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." The petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *see also Parker v. Matthews*, 567 U.S. 37, 41 (2012). Under the statute, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), district courts are required to give great deference to the determinations of the state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 772–73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

Federal law is clearly established for the purposes of the statute where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court. *See Woods v. Donald*, --- U.S. ---, ---, 125 S. Ct. 1372, 1376 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute

that they were wrong." *Id.* Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

**B. Analysis**

1. Petitioner's Evidentiary claims

        In three of the four claims Petitioner raises in his habeas petition, Petitioner seeks to challenge the decision of the state courts to admit various pieces of evidence—specifically Marshall's testimony regarding having seen Petitioner with a silver revolver on several occasions, Marshall's statement to Daniel Laporte that she and Petitioner were going to Atlantic City after leaving the recording studio, and a "mugshot" photograph of Petitioner. Because "the Due Process Clause does not permit the federal courts to engage in a finely-tuned review of the wisdom of state evidentiary rules," *see Marshall v. Lonberger*, 459 U.S. 422, 438 (1983), claims challenging the admissibility of evidence are normally considered questions of state law which are not cognizable in habeas corpus. *See Keller v. Larkins*, 251 F.3d 408, 416 n. 2 (3d Cir. 2001) ("A federal habeas court . . . cannot decide whether the evidence in question was properly allowed under the state law of evidence"); s*ee also Estelle v. McGuire*, 502 U.S. 62, 67-70 (1991); *Wilson v. Vaughn*, 533 F.3d 208, 213-14 (3d Cir. 2008), *cert. denied*, 556 U.S. 1170 (2009). A petitioner may therefore raise a habeas claim based on state evidentiary rulings only where he can show that the admission of the evidence in question denied him Due Process under the Fourteenth Amendment by depriving him of the "fundamental elements of fairness in [his] criminal trial." *Glenn v. Wynder*, 743 F.3d 402, 407 (3d Cir. 2014) (quoting *Riggins v. Nevada*, 504 U.S. 127, 149 (1992) (Thomas, J. dissenting)). "The Supreme Court has defined the category of infractions that violate fundamental fairness very narrowly, based on the recognition that, beyond the specific guarantees enumerated

8

in the Bill of Rights, the Due Process Clause has limited operation." *Id.* (internal quotations omitted) (citing *Medina v. California*, 505 U.S. 437, 443 (1992)). "In order to satisfy due process, [Petitioner's] trial must have been fair, it need not have been perfect." *Id.* (citing *United States v. Hasting*, 461 U.S. 499, 508 (1983)). In the absence of a decision which is clearly contrary to or an unreasonable application of relevant Supreme Court case law, a habeas petition can thus only succeed in challenging an evidentiary ruling on Due Process grounds by showing that the ruling in question was "so arbitrary or prejudicial that it rendered the trial fundamentally unfair." *Scott v. Bartkowski*, No. 11-3365, 2013 WL 4537651, at *9 (D.N.J. Aug. 27, 2013) (citing *Romano v. Oklahoma*, 512 U.S. 1, 12–13 (1994)).

Petitioner first challenges the admission of statements by Marshall in which she testified that she had seen Petitioner in possession of the silver handgun contained in the beach picture on several other occasions and that she had taken him to buy bullets for the weapon at a private home after which she saw Petitioner load the gun with those bullets. Petitioner contends, as he did in the state courts, that this testimony amounts to prior bad act testimony which should not have been admitted under the New Jersey Rules of Evidence. Petitioner fails to identify any Supreme Court caselaw to which the admission of this evidence is contrary, nor does he explain how the admission of this evidence was contrary to any decision of the Supreme Court.[1] Instead, Petitioner essentially

---

[1] Belatedly, in his reply brief, Petitioner attempts to argue that the admission of the prior bad acts claim amounts to a failure of the State to prove his crimes by sufficient evidence in violation of *Jackson v. Virginia,* 443 U.S. 307, 319 (1979). Pursuant to *Jackson*, a habeas petitioner challenging the sufficiency of the evidence against him can only succeed on such a claim by showing that when the acts are viewed in the light most favorable to the state no "rational trier of fact could have found the essential elements" of the charged crimes beyond a reasonable doubt. *Eley*, 712 F.3d at 847 (quoting *Jackson*, 443 U.S. at 319). Petitioner presents no argument as to how the admission of the alleged prior bad acts testimony rendered the evidence against him insufficient under *Jackson*, and instead merely asserts that the evidence should have been admitted, attempting to use *Jackson* as a catch-all source of authority to overturn state evidentiary rulings in exactly the fashion which the caselaw forbids for the reasons expressed above. *Jackson* is wholly inapplicable to Petitioner's prior bad acts claim, and even in the absence of that testimony, there was more than sufficient evidence presented at trial when viewed in the light most favorable to the State to support Petitioner's robbery, felony murder, and weapons charges, and thus Petitioner's claim would fail even if it were reinterpreted as a sufficiency of the evidence claim. Petitioner's belated raising of *Jackson* thus provides no basis for relief.

reasserts the state law-based arguments he presented in the state courts in support of his contention that the admission of this evidence was contrary to state evidentiary rules. To the extent Petitioner intended to argue that the admission of prior bad acts testimony *per se* violates the constitution, he is mistaken. As the Third Circuit has observed, there is no Supreme Court decision which clearly established that the admission of prior bad acts testimony "constitutes a violation of federal fair trial rights. Importantly, the most relevant Supreme Court cases suggest the contrary. *See, e.g., Estelle*[, 502 U.S. at 64] (allowing evidence of prior injuries in a trial for infant murder, and refusing habeas relief for a deficient limiting instruction); *Greer v. Miller*, [483 U.S. 756 (1987)]; *Spencer v. Texas*, [385 U.S. 554, 555 (1967)] (rejecting a due process challenge to a state rule admitting evidence of prior similar crimes when the judge gives a limiting instruction)." *Minett v. Hendricks*, 135 F. App'x 547, 553 (2005).

There is thus no basis for this Court to find that the admission of this evidence in and of itself violated Due Process, and Petitioner could only prevail on his claim if he established that the admission of the alleged bad acts testimony was so arbitrary or prejudicial that it deprived him of a fundamentally fair trial. Having reviewed the record of this matter and the rulings of the state courts, it is clear that the admission of the gun related statements by Marshall were neither arbitrary nor overly prejudicial. As the state courts explained in lengthy opinions, the testimony of Marshall that she had seen Petitioner with the silver revolver on several occasions before and after the shooting of her landlord was directly relevant to a fact which was a necessary element of several of the crimes with which Petitioner was charged – that Petitioner possessed and used the silver revolver used to shoot her landlord. That she saw him purchased bullets at a private residence likewise supported the assertion that this silver revolver was the murder weapon as the bullets used in the shooting were illegal hollow point bullets which cannot be purchased in lawfully operated

shops in New Jersey. That those courts found Marshall's testimony to be clear and convincing evidence of Petitioner's ownership of the weapon, and that Marshall's testimony was credible and that its probative value outweighed any undue prejudice further supports the conclusion that the decision to admit the evidence was neither arbitrary, overly and unduly prejudicial, or fundamentally unfair. This Court therefore concludes that the admission of the evidence did not deprive Petitioner of a fundamentally unfair trial, and the admission of this evidence provides no basis for habeas relief.

Petitioner also attempts to argue that the failure of the trial court to give a curative instruction regarding the alleged bad acts testimony at the time it was given violates his right to Due Process. That argument, however, is foreclosed by the fact that his trial counsel specifically waived any claim of prejudice or wrongdoing and agreed to the decision to wait until the final jury charge to give the curative instruction as to the weapon related testimony. Any claim of prejudice arising from that decision, to which defense counsel agreed, amounts to invited error, which is patently insufficient to warrant habeas relief. *See, e.g., United States v. Maury*, 695 F.3d 227, 256-57 (3d Cir. 2012) (invited error doctrine prevents a petitioner from raising a claim challenging an action of the trial court which he invited or induced through his own or his counsel's actions unless the law which led him to invite that error has since been rendered constitutionally infirm). In any event, that the instruction to which the parties agreed was ultimately given to the jury and fully and forcefully explained to them the limited purposes for which the evidence was to be given was more than sufficient to alleviate any prejudice which could have resulted from the tardy instruction, and Petitioner would not be entitled to relief on that basis in any event. *See Fry v. Piller*, 551 U.S. 112, 116 (2007) (even errors of constitutional dimension are considered harmless on collateral review "unless [the alleged error] had a substantial and injurious effect or influence in determining

the jury's verdict"); *see also Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993). Petitioner's bad acts claims thus fail to present any basis for habeas relief.

Petitioner next challenges the admission of testimony by Daniel Laporte that Marshall told him that she and Petitioner were going to Atlantic City after leaving the recording studio shortly after the robbery and shooting of her landlord. Petitioner contends that this amounts to inadmissible hearsay as he believes Marshall's statement of her intent to go to Atlantic City improperly led the jury to infer that this was also Petitioner's intention, buttressing the credibility of Marshall's testimony that she and Petitioner went to Atlantic City that night and Petitioner confessed to shooting her landlord at that time. As with his previous claim, Petitioner presents arguments solely based on state law and fails to identify any clearly established Supreme Court caselaw to which the state court decisions acted contrarily or otherwise unreasonably applied. As the State courts determined that the admission of this testimony did not violate their evidentiary rules, as Petitioner has failed to show that the admission of the hearsay evidence in question was contrary to or an unreasonable application of any applicable federal law, as it is clear from the context of Petitioner's trial that the admission of the hearsay statement, which only indicated that Marshall intended to go to Atlantic City with Petitioner after leaving Laporte's studio, was not capable of having a "substantial or injurious" effect upon the jury's verdict in light of the other testimony provided at trial, specifically Marshall's own testimony and the picture of Petitioner taken in Atlantic City, and as this Court finds that the testimony did not deprive Petitioner of a fair trial, this Court concludes that the admission of the hearsay evidence fails to present a valid basis for habeas relief.

In his final evidentiary claim, Petitioner asserts that the admission of a "mugshot" photo of his face taken while he was apparently in prison deprived him of a fair trial. The record indicates

that the photo in question, which was presented to Laporte who identified the photograph as Petitioner and the man who had come with Marshall to the recoding studio the night of the shooting, was a "cropped, black-and-white photograph of [Petitioner] with no identifiers" which "while clearly an identification photograph, bore no indication that it was taken as the result of criminal activity on [Petitioner]'s part." (ECF No. 9-7 at 23–24). Given the fact that Laporte identified the photograph as being Petitioner and identified Petitioner himself as the man who came to the studio the night of the shooting at trial in any event, as the photograph was nothing more than a black and white photo of Petitioner without anything which would suggest criminal activity on Petitioner's part, and given the remaining evidence produced at Petitioner's trial, it is clear that the admission of the photo did not render Petitioner's trial fundamentally unfair, and was in any event harmless as the photo was incapable of having a substantial and injurious impact upon the jury's determination. Petitioner is thus not entitled to habeas relief on any of his evidentiary claims.

2. Petitioner's Improper Summation claim

In the final claim presented in Petitioner's habeas petition, Petitioner claims that various statements made by the prosecutor during summation were not proper and amounted to improper vouching for the credibility of Marshall. The duty of a prosecutor in a criminal trial is not to secure convictions, but to see that justice is done, and prosecutors must therefore "refrain from [the use of] improper methods calculated to produce a wrongful conviction." *Berger v. United States*, 295 U.S. 78, 88 (1935); *see also United States v. Bailey*, 840 F.3d 99, 124 (3d Cir. 2016). While a prosecutor "may strike hard blows [during his summation], he is not at liberty to strike foul ones." *Berger*, 295 U.S. at 88; *Bailey*, 840 F.3d at 124. A criminal conviction, however, "is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or

conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *United States v. Harris*, 471 F.3d 507, 512 (3d Cir. 2006) (quoting *United States v. Young*, 470 U.S. 1, 11 (1985). Improper comments by a prosecutor during summation will therefore only warrant habeas relief where those comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *see also Copenhefer v. Horn*, 696 F.3d 377, 392 n. 5 (3d Cir. 2012).

A prosecutor's comments can cross the lines of propriety where the prosecutor improperly vouches for the credibility of a witness. This occurs where the prosecutor assures the jury of the witness's credibility not based on the evidence and testimony presented at trial, but on the basis of the prosecutor's personal knowledge or some other extrinsic information available to the prosecutor but not presented to the jury. *See United States v. Walker*, 155 F.3d 180, 184, 187 (3d Cir. 1998); *see also United States v. Lore*, 430 F.3d 190, 211–12 (3d Cir. 2005). As the Third Circuit explained in *Walker*,

> A prosecutor's vouching for the credibility of a . . . witness raises two concerns: (1) such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and (2) the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.
>
> . . . .
>
> Our case law indicates that to find vouching two criteria must be met: (1) the prosecutor must assure the jury that the testimony of a Government witness is credible; and (2) this assurance is based on either the prosecutor's personal knowledge or other information not contained in the record. Thus, it is not enough for a defendant . . . to assert that the prosecutor assured the jury that

a witness' testimony was credible. The defendant must be able to identify as the basis for that comment an explicit or implicit reference to either the personal knowledge of the prosecuting attorney or information not contained in the record. It follows that where a prosecutor argues that a witness is being truthful based on the testimony given at trial, and does not assure the jury that the credibility of the witness based on his own personal knowledge, the prosecutor is engaging in proper argument and is not vouching. Likewise, prosecutorial comment that points to a lack of evidence in the record which supports a defendant's argument that the witness is not credible is proper so long as the comment does not constitute an assurance by the prosecutor that the witness is credible.

*Walker*, 155 F.3d at 184.

In order to evaluate the prosecutor's comments at Petitioner's trial, one must consider the argument to which the prosecutor was responding—defense counsel's own summation. Unsurprisingly given the centrality of her testimony at Petitioner's trial, defense counsel's summation forcefully and repeatedly attacked the credibility of Staci Marshall. (ECF No. 9-25 at 24-26). Indeed, Defense counsel specifically stated that "Staci Marshall's a liar," and spent a considerable portion of his summation recounting what counsel considered Marshall's "lies" and their importance to Petitioner's case. (*Id.* at 26-50). In so doing, counsel made his contention that Marshall was an untrustworthy and inveterate liar the centerpiece of his summation and argued that Marshall's testimony implicating Petitioner was an attempt by Marshall to place the blame for her own actions and crimes on Petitioner in hopes of having her fifteen-year prison sentence result in an early release on parole following her cooperation with the State. (*Id.* at 30–50, 60–65). Defense counsel further argued that, other than Marshall, nothing connected Petitioner to the shooting of her landlord, that Petitioner had no reason to help her rob her landlord as they had only been dating for two months at the time, and suggested that Marshall remained involved with other men who could have been her co-conspirator instead of Petitioner. (*Id.* at 65–67). Counsel

concluded by arguing that "Staci Marshall lied to get herself a deal. It's unfortunate, but don't let your verdict ben affirmation of her lie." (*Id.* at 71).

In response to these repeated attacks on the credibility of Marshall and defense counsel's attempt to argue that Petitioner was an unwitting victim of Marshalls "lies," the prosecutor argued in her summation that Marshall's testimony was credible based on the evidence in the record and based on Marshall's clear acceptance of responsibility for her part in the robbery indicated by Marshall's confession to the police, guilty plea and sentence, and testimony during Petitioner's trial. (*Id.* at 72–112). As part of that argument, the prosecutor referenced and quoted testimony given by Marshall regarding her relationship with Petitioner, referenced testimony regarding Petitioner's interactions with other women, and discussed the crime itself:

> [Marshall]'s not a liar, ladies and gentlemen. She's the kind of woman that a man, or that men, take advantage of and will manipulate and make no mistake, [Petitioner] manipulated her. He used her for whatever reason, she let him. She lived for him. She did whatever he wanted. She wasn't some Cougar out there manipulating some young guy[,] he liked older women anyway. She let him into her life. She opened her heart, her home and exposed her child, and he took full advantage. You know, . . . in this case . . . you heard about three . . . women in [Petitioner]'s life.
>
> You heard about three women and you know what? He took full advantage of them with the expectation that each and every one would have his back. It's not what [Petitioner] could do for them, but what these women could do for [Petitioner]. You know, it's all about [Petitioner]. And let's start with [Marshall]. . . . What could she do for him? She let him stay over. She brought him clothes. She purchased him gloves. She drove him around to and from work. She drove him to buy bullets. He didn't even have a car. She gave him the keys to her car for a week before the murder, because he needed a ride. She didn't have to do that.
>
> She took him to a wedding. She held him out in her life as her boyfriend. She tried to help him with his career. She took his picture everywhere. She took it to the [recording] studio—she was proud of him. He was something maybe she wanted to attach herself [to], this up and coming rapper. She takes his picture at the video

shoot. She takes his picture in Atlantic City. Interestingly, she takes his picture in Atlantic City posing in front of a memorial, a Veterans Memorial. So [Petitioner] and the Veterans. [Petitioner] smoking with the veterans. The irony in that.

Notice . . . what's interesting is you're gonna have the pictures in the camera, you're gonna get to see them and you know what? Look at them. No pictures of [Marshall]. All about [Petitioner]. Everything's about [Petitioner]. Not one picture of [Marshall] in this camera. Nothing. She lives for him. It's all about [Petitioner]. It's all about [Petitioner]. I need you to drive me somewhere, it turned out to be the bullets. I need the keys to your car. I want to be a rapper. I need to go to the video shoot. I'm going to pose with my gun, take my picture. I will come for you if you turn on me. I will take care of it, don't worry about it. I need a ride home after the video shoot. I felt like shooting my gun that day. I, I, I, I – all about him. All about him.

[Petitioner] is the puppet master pulling the strings, not Staci. Look at her. You saw her. She's pathetic. She's the pawn in his game, the game is all about [Petitioner]. So much for taking responsibility, like he said. He even used her address when he's arrested. On the arrest report. When the police come, where do you live? 103 Melrose, he tells them verbally. But when he's actually arrested, whose address did he list? He lists her. Is she taking advantage of him? No.

The second woman in his life that he plays out, Kendra Brown. Kendra Brown, a nice lady, by everyone's account. Very nice. She had no ax to grind against [Petitioner], she said nothing – she said he was nice. So does [Marshall], as far as that matter[s]. [Marshall] didn't hate [Petitioner] at the end of the relationship, everything was fine between them, too. Same thing with Kendra, nice guy in the building. For whatever reason, he shows up that Monday to her apartment – hi, can I borrow your cellphone? Yeah. Why . . . can't you just use your own cellphone? 'Cause the minutes are low, whatever it was, the battery's low – whatever.

So he picks up her cellphone. Come on, come on, pick up, pick up, pick up, I need an alibi, pick up. Where's [Marshall] at this point? Where is [Marshall]? She's at the police station. Remember, she told you, again the phone records, look at the times. The very end of the phone records, the very last calls, 9:22, these last phone calls. She's chirping him from the police department, remember, she told you that? They're not talking any more though and where

is he? At work. He knows too the police are coming. He knows the police are coming. He knows she's down there giving it up.

I need an alibi, come on, pick up, pick up. What would Kendra Brown have to [gain by] making this testimony up? Is she making it up too? Is she framing him? He sent her there. He sent her there 'cause he thought she was going to protect him. Just like the . . . letter. A few months later, or whatever she said it was, she gets a letter from him in the mail. She didn't save it. She was upset by it. She threw it out. Can you call my lawyer? Could you call my lawyer up and help me out with my case? Could you call me up – call him, help me, come on, give my lawyer a call. Is she making that up? Who's this woman? She's someone in the building where he worked. She's not making this up. This isn't some big conspiracy that all these people are getting together and conspiring against [Petitioner].

Yes, the police get the phone records of the phone number used. You're gonna have Kendra's records. Isn't it a coincidence that he calls someone at 103 Melrose Avenue in Irvington, a Darrick Daniels. He calls someone on Melrose Avenue, where we know Staci dropped him off, his aunt lives there, a cousin, she even said maybe a mother; she wasn't sure.

. . . So here's Kendra, another woman[, and Petitioner's ] hoping she will protect his name. Another woman he can use when this plan backfired. . . . what he didn't count on was Kendra . . . telling the truth. The police come, they talk to her, she gives a statement, she gets the records. He tried to use her, he tried. But she told the truth. And he tried to use her again with the letter and again, she told you about that.

The third woman, and you don't actually hear from the third woman, you just hear her name mentioned; if the police come for me, I am going to say I was with Serita Sapp. Again, . . . if the police come for me, [Petitioner]'s telling [Marshall] when they're waiting for the police to arrive, they know they're coming, I'm going to say I was with Serita Sapp. Another woman [Petitioner] attempts to use. And what's interesting again, on his contact records when he was arrested, whose name does he list as a contact person? Serita Sapp of 57 Mt. Vernon Avenue.

Is [Marhsall] involved in this? . . . Police take [her] on Monday, ladies and gentlemen. She realizes the game is up, she gives her statement. She admits it's her; she admits it's [Petitioner].

It's not some other man that she conspired with. It's not. She admits it's him because it is him.

. . . she told police the truth from the very beginning on who she did it with. There are no other men in her life. She's not implicating anyone but herself and him. She sees she likes to take pictures, again, you'll have the pictures in evidence. There are no other men – in any of those photographs, there's no . . . other men. Clearly this is a woman that likes to take pictures of people in her life. There's no other people on that camera but [Petitioner].

And you know what? What would be gained by not implicating the right person? Think about this, from a really logical standpoint. What could be gained by not implicating the right person? So here you are gonna implicate yourself and then you're gonna pick [Petitioner], okay, he's innocent. I'm gonna let the real shooter go. I'm gonna let the real shooter enjoy his life for the next fifteen years while I rot away. . . . I ruined my life. I humiliated my family. Children are not allowed to play with her daughter because of what she did. Let me humiliate everybody that I know. For what? For some strange man to enjoy his freedom? While I sit here and rot and blame poor, innocent [Petitioner]? That makes no sense. It's just not logical.

I'm gonna implicate the one I did it with, the one I was dating, the one I shared my life with, the one I lived for, the one I thought was my world. The one I was trying to be his manager. The one who I was making plans with to move maybe to North Carolina, or wherever it was – to protect some complete stranger? This . . . would benefit no one. She implicates [Petitioner] because it's him.

. . . .

[The prosecutor then discussed a hat found near the victim at the scene of the shooting and suggested that the hairs found in the hat suggest it most likely belonged to the victim, and not to a mystery other man defense counsel suggested may have worked with Marshall in place of Petitioner. The Prosecutor also suggested the jury should focus on who had the gun in this matter, and Marshall's testimony and pictures which place the possible murder weapon in Petitioner's hands on numerous occasions.]

Three people truly know who had the gun [in this case]. We have [the victim], who's not with us; Marshall and [Petitioner]. Which one of these three people is holding the gun? Which one of these three people is looking for an alibi? Which one of these three

people is looking for an alibi? Which one of these three people is going to some house to buy bullets. Come on, ladies and gentlemen, hold him accountable for his actions. It wasn't [the victim's] time to go. His life was abruptly cut short because [Petitioner] felt like shooting his gun that day.

. . . .

Now, it's your turn. It's your turn to have your role in this case. [The victim] died at the hands of [Petitioner]. [Marshall] was involved. [Marshall] is guilty of robbery. I am not happy with myself. I'm disappointed with myself. I disappointed my family, I've humiliated my family. I've embarrassed my daughter. I mean, to the point where even some of her friends aren't allowed to play with her. The man lost his life. His children don't have a father. There's no excuse, I'm extremely angry at myself, been sitting in jail for 26 months. I've lost time with my child.

But I have to take responsibility for my actions. To go on, to sit in denial, wouldn't be right. I've cried as much as I can. I've asked God for forgiveness, as much as I can ask God for forgiveness. I don't really know what to say for myself in regards for why; there's no excuse. It was just a very, very bad decision on my part.

Ladies and gentlemen, [the victim] died at the hand of [Petitioner] because he felt like shooting his gun that day. Keep your eye on the gun.

(*Id.* at 92–112).

Viewed in context, it is clear that the prosecutor in this matter did not commit any improper vouching or otherwise engage in misconduct sufficient to amount to a violation of Due Process. Although the prosecutor engaged in what was likely an emotionally charged exchange when she paraphrased and quoted Marshall during her summation, all of her comments were drawn from or based upon the evidence which was presented at trial. Likewise, the arguments Petitioner charges regarding Marshall's credibility were a direct and fair response to the lengthy and forceful challenge to Marshall's credibility raised by defense counsel. As the prosecutor's comments regarding Marshall and her testimony were essentially fair comment, and as Petitioner has failed

to show that those comments amount to either improper vouching or otherwise deprived him of a fundamentally fair trial, Petitioner's summation claim related to Marshall's testimony provides no basis for habeas relief.[2]

Petitioner also argues in his reply brief that the prosecutor's discussion of a hat containing hairs from a mixed-race individual that was found at the scene were improper because no DNA testing was done on the hairs in the hat to confirm that they did belong to the victim. Petitioner's argument, however, asserts a requirement that does not exist—prosecutors are permitted to make fair comment on the evidence presented, including drawing reasonable inferences from the evidence, there is no requirement that every assertion or argument raised by a prosecutor need be supported by iron clad DNA evidence. The evidence in the record indicated the hat was found at the scene near the victim and the other possessions he had at the time of the shooting, and suggested that the hat did not belong to Petitioner, but rather to a mixed-race individual such as the victim. That the hat belonged to the victim was a reasonable inference from the facts presented, and that argument was raised directly in response to the defense's suggestion that Marshall framed Petitioner and had robbed the victim through a different man. As the argument was based on the evidence in the record and was based on a fair and reasonable inference from the evidence provided, this argument in no way deprived Petitioner of a fair trial, and Petitioner's hat-related argument provides no basis for habeas relief.

---

[2] In his reply brief, Petitioner attempts to buttress this claim by asserting that the prosecutor's bad faith could be proven through the fact that the prosecutor elicited testimony from a ballistics expert that the bullet used in this instance most likely came from a revolver, testimony that was later excluded because the expert could not make that conclusion to a reasonable degree of medical certainty as the bullet could have been fired from a revolver or automatic. Although Petitioner believes that this amounts to bad faith on the part of the prosecutor, the Appellate Division rejected that contention, and this Court finds no evidence of bad faith in the prosecutor's actions during her summation. In any event, even if there had been bad faith in the ballistics expert incident, that testimony was eventually excluded, and there is no logical connection which would require the Court to conclude that bad faith in one instant would infect all later, even unrelated actions by a prosecutor with bad faith. In any event, this argument was raised for the first time in reply, and this Court is free to and does reject if for that reason as well as explained in more detail below in relation other claims raised for the first time in reply.

In his final summation related argument, Petitioner contends that comments by the prosecutor related to Marshall's confession and the photographs of Petitioner with a gun, as well as her discussion of Marshall's testimony regarding Petitioner's promise to her that he would take responsibility if the police came for him, amount to an indirect but improper comment on Petitioner's choice not to testify or give a statement to the police. Although the prosecutor did comment on Marshall's testimony that Petitioner had told her he would "take the weight" for the robbery and then threatened her not to implicate him in the crime, and did in turn discuss the fact that Marshall eventually spoke to the police and confessed, the prosecutor did not comment on Petitioner's failure to give a statement, nor did she discuss the fact that Petitioner did not testify at trial. Petitioner's argument that the jury should have read into her summation, quoted above, an implied comment on Petitioner's refusal to testify or speak to the police, is little more than Petitioner's opinion, and is patently insufficient to show any impropriety which would warrant habeas relief. Viewed in context, it is clear that none of the comments made by the prosecutor deprived Petitioner of a fair trial. Petitioner's improper vouching and summation claims are therefore without merit and are denied.

3. Petitioner's additional claims raised for the first time in reply

While Petitioner raised the claims discussed above in grounds one through four of his original habeas petition in this matter (*see* ECF No. 1), in his reply brief, he attempts to raise for the first time five additional claims including several claims of ineffective assistance of counsel, a challenge to the length of his sentence, and a claim regarding the handling of certain jury questions regarding the surveillance video and testimony of Lieutenant DeMaio in relation thereto presented at trial. It is axiomatic that a party "may not raise new issues and present new factual materials in a reply brief that it should have raised in its initial brief." *D'Allesandro v. Bugler Tobacco Co.*,

No. 05-5051, 2007 WL 130798, at *2 (D.N.J. Jan. 12, 2007) (quoting *Int'l Raw Materials, Ltd. V. Stauffer Chem. Co.*, 978 F.2d 1318, 1327 n. 11 (3d Cir. 1992)); *see also Judge v. United States*, 119 F. Supp. 3d 270, 284 (D.N.J. 2015). This doctrine applies not only in standard civil suits, but is also applicable to reply briefs in habeas proceedings as "[b]asic fairness requires that an opposing party have a fair notice of his adversary's claims, as well as an opportunity to address those claims." *Judge*, 119 F. Supp. 3d at 284 (quoting *Soto v. United States*, No. 04-2108, 2005 WL 3078177, at *6 (D.N.J. Nov. 16, 2005)); *see also Thompson v. United States*, No. 12-1312, 2015 WL 1344793, at *6 n.9 (D.N.J. Mar. 23, 2015). The prohibition against raising new claims in a reply brief is "especially applicable" in the habeas context where the Petitioner was advised, and has in turn certified that he is aware, that he was required to raise all of his claims in a single habeas petition as Petitioner did in this matter,[3] (*see* ECF No. 1 at 14). *Judge*, 119 F. Supp. 3d at 284; *see also Rodriguez v. United States*, No. 04-158, 2005 WL 2007033, at *9 n.7 (D.N.J. Aug. 22, 2005) (courts should "not permit [a p]etitioner to . . . adopt an additional claim in a reply brief at the eleventh hour" where he has previously been advised and he has previously acknowledged that he is required to bring all claims in a single petition). As Petitioner's arguments regarding his sentencing, jury question, and ineffective assistance claims were raised for the first time in Petitioner's reply brief, filed eight months after his initial petition and approximately four months after the State's answer, this Court declines to address those claims as they were improperly raised by Petitioner at the eleventh hour after Respondents had already addressed those claims Petitioner properly raised in his initial habeas petition.[4] *Judge*, 119 F. Supp. 3d at 284.

---

[3] In his petition, Petitioner certified under penalty of perjury that he had been "notified that [he] must include in this petition all the grounds for relief from the conviction or sentence that [he] challenged, and that . . . if [he] fail[ed] to set forth all the grounds in this petition, [he] may be barred from presenting additional grounds at a later date." (ECF No. 1 at 14).

[4] Although the Court need not, and does not, address the merits of these improperly raised claims, the Court notes that Petitioner raised these claims for the first time in this matter when he filed his reply brief, which is dated January 15, 2019, (*See* ECF No. 15), well over a year from the date on which Petitioner's state collateral relief proceedings

## III.    CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of a state court proceeding unless he has "made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). As Petitioner's properly raised claims are clearly without merit for the reasons expressed above, Petitioner has failed to make a substantial showing of the denial of a constitutional right and he is denied a certificate of appealability.

## IV.    CONCLUSION

For the reasons set forth above, Petitioner's habeas petition is hereby DENIED, and Petitioner is hereby DENIED a certificate of appealability. An appropriate Order follows.

Dated: April __17__, 2019.

JOSE L. LINARES
Chief Judge, United States District Court

---

concluded with the denial of certification on September 11, 2017. (ECF No. 9-16). Because all habeas claims are subject to a one year statute of limitations which normally runs from the conclusion of direct review, *see Ross v. Varano*, 712 F.3d 784, 798 (3d Cir. 2013); *Jenkins v. Superintendent of Laurel Highlands*, 705 F.3d 80, 84 (3d Cir. 2013), and because any statutory tolling of that one year limitations period concluded with the denial of certification, *see Jenkins*, 705 F.3d at 85, Petitioner's newly raised claims are time barred absent some basis for equitable tolling as they were raised for the first time sixteen months after Petitioner's one year limitations period resumed running with the conclusion of state PCR proceedings. That the four claims raised in Petitioner's original petition were timely filed does not change the fact that Petitioner's newly raised claims would be time barred absent some basis for equitable tolling even were this Court to consider them. *See generally Fielder v. Varner*, 379 F.3d 113 (3d Cir. 2004) (timeliness of habeas claims determined on a claim by claim basis); *Duncan v. Walker*, 533 U.S. 167 (2001) (filing of habeas petition does not toll or arrest the running of the habeas limitations period).